JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50521 | **DATE** | 9/27/2004 |
| **CASE TITLE** | Mauerman vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | 9-28-04 | | 14 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 9/27/2004 | | |
| AM | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | GG mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

HEIDI L. MAUERMAN,                    )
                                      )
        Plaintiff,                    )        Case No. 03 C 50521
                                      )
    v.                                )        Magistrate Judge
                                      )        P. Michael Mahoney
JOANNE B. BARNHART,                   )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
        Defendant.                    )


## MEMORANDUM OPINION AND ORDER

Heidi Mauerman ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on February 9, 2004. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for SSI on May 16, 2002 (Tr. 88), and her application for benefits was denied on June 26, 2002. (Tr. 54). Plaintiff filed a request for reconsideration on August 1, 2002 (Tr. 59), and was subsequently denied reconsideration on October 28, 2002. (*Id.*). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on November 14, 2002. (Tr.66). Plaintiff appeared, with counsel, before an ALJ on July 10, 2003. (Tr. 21). In a decision dated August 29, 2003, the ALJ found that Plaintiff was not entitled to SSI. (Tr. 13-18).

On September 2, 2003, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 9). The Appeals Council denied Plaintiff's request for review on October 3, 2003. (Tr. 5-7).

## II. FACTS

Plaintiff was born on April 10, 1975, and was twenty-eight years old at the time of her July 10, 2003, hearing before the ALJ. (Tr. 21, 24). Plaintiff completed her education through the eighth grade and has a GED. (Tr. 25). At the time of her hearing, Plaintiff lived with her mother and her three children, ages eleven, three, and six. (Tr. 24). Plaintiff is approximately five foot six inches tall and weighed, at the time of the hearing, 138 pounds. (*Id.*). Plaintiff claims disability since October 12, 2000, because she was injured in an automobile accident on October 11, 2001. (Tr. 24, 186). At the time of the hearing, Plaintiff had the following medically determinable impairments: degenerative disc disease, adjustment disorder, and pain disorder associated with both psychological factors and general medical condition. (Tr. 17).

Plaintiff had no reported income since October, 2000. (Tr. 30). Plaintiff worked for Goodwill Industries as a receptionist from February or March, 2000 until October, 2000. (Tr. 25, 96, 108). Plaintiff answered phones, greeted guests, and paged personnel. (Tr. 91). Plaintiff worked six hours a day, five days a week, and she received seven dollars per hour for her services. (Tr. 96). Plaintiff's work was primarily sedentary, but some walking was required. (Tr. 108). Plaintiff stated that she stopped working for Goodwill Industries due to the injuries she sustained in the October automobile accident. (Tr. 24-25).

Plaintiff also worked part-time as a waitress/hostess in 1995. (Tr. 108, 110). Plaintiff took orders and carried food to customers. (Tr. 110). This position required frequent standing,

walking, and lifting of objects less than ten pounds. (*Id.*). Plaintiff was paid five dollars an hour for her services. (*Id.*). It appears that Plaintiff may have also waited tables part-time in 1993, but the record is inconsistent. (Tr. 96, 108).

Plaintiff described her ability to function around the house as limited. Plaintiff's mother and children perform most of the normal household tasks like cooking meals and cleaning. (Tr. 31). Plaintiff does assist her family with chores by doing dishes and clearing the dinner table. (Tr. 31, 41). Plaintiff's mother, however, works during the day, so Plaintiff also has friends and a sibling that visit her during the day to help out approximately three days a week. (Tr. 39, 40). Plaintiff cannot engage in physical activities with her children, but does read to them and occasionally play board games, (Tr. 41-42). Plaintiff reported that she does not go out to socialize with her friends anymore. (Tr. 40).

While Plaintiff has been bothered by pain since her automobile accident, she testified that some days are better than others. (Tr. 29). At her hearing, Plaintiff stated that anytime she puts pressure on a disc in her back, she would experience pain in her left and right side of her back, her lower back, and upper thighs. (Tr. 28-29). Plaintiff also noted that her upper thighs go numb when she sits, and that she sometimes experiences pain in her leg due to a sciatic nerve. (Tr. 29).

Plaintiff also described an onset of depression since her accident. (Tr. 30). Plaintiff testified that she feels guilty and depressed because she cannot do anything with her children and that she sometimes has outbursts where she starts crying for no reason. (Tr. 32). Plaintiff stated that sometimes she does not want to get out of bed in the morning, talk to anyone, or go outside. (Tr. 32). To treat her depression, Plaintiff takes 40 milligrams of Paxil. (Tr. 33). While Plaintiff reported at her hearing that the Paxil does make a difference in her emotional state (Tr.

3

40-41), she also stated that she is inconvenienced by the side effects of her medication because it makes her sleepy and nauseous. (Tr. 33, 36). Additionally, Plaintiff testified that her medications interfere with her ability to drive (Tr. 36), noting that she does not drive when she is taking her medication. (Tr. 36-37).

At the time of Plaintiff's hearing, she took four prescription medications, including Paxil, Relafen, Vicodin, and Hydrocodone. (Tr. 272). Plaintiff represented that she could sit continuously for thirty to forty-five minutes at a time before needing to get up (Tr. 33). Plaintiff was unsure how long she could stand at one time (Tr. 34), but testified that she could walk two blocks at a time, though she would be in pain. (Tr. 34). Plaintiff also testified that she could lift a gallon of milk off the table, but not the floor. (Tr. 34-35).

Vocational expert, Frank Mendrick, testifying before the ALJ stated that Plaintiff's past work as a telephone receptionist was classified as semi-skilled and sedentary work. (Tr. 43-44). Mr. Mendrick found that Plaintiff's waitress/hostess position was a semi-skilled position with a light exertional level required. (Tr. 44-45). The ALJ then asked Mr. Mendrick whether a hypothetical female, with the following characteristics, could perform work in the economy:

> Taking someone of Ms. Mauerman's age which has ranged from 25 to 28 during the period at issue. Work experience as you described it. Who for purposes of this question can lift up to 20 pounds occasionally, 10 pounds frequently. Sit, stand, or walk as required. Can only occasionally climb, balance, stoop, kneel, crouch, and crawl. Cannot perform detailed or complex tasks.

(Tr. 45).

Mr. Mendrick testified that such a hypothetical female could not do the past work of the Plaintiff, but could work at unskilled jobs with a light level of exertion in assembly (10,000 positions in the six-county Chicago metropolitan area plus Winnebago and Boone Counties),

4

inspection (4,000 positions), and hand-packing jobs (8,000 positions). (Tr. 45). The ALJ then added a requirement whereby the worker would need to change positions every forty-five minutes to an hour and lift ten pounds only occasionally. (Tr. 45). Mr. Mendrick indicated that such requirements would decrease the number of jobs available in the economy to 5,000 for assembly work, 1,000 for inspection, and 2,000 for hand packing. (Tr. 46). The ALJ then qualified her statement, adjusting the sit-stand requirement to no more than thirty minutes continuous sitting/standing at a time and adding difficulty bending from the waist. (Tr. 46). Mr. Mendrick testified that he would re-classify the work as sedentary, number one, and reduce the assembly work positions to 3,000. (Tr. 46). The vocational expert noted that factory rates are typically set to allow ten minutes out of every hour to be used for personal rest and stretching at the work station. (Tr. 47). Finally, the ALJ inquired about the allowable rate of absenteeism for the remaining jobs. (Tr. 48). Mr. Mendrick replied that six days a year for illness would be typical and that the most he had seen was twelve days a year. (Tr. 48). The ALJ then closed Plaintiff's hearing, but allowed the record to remain open for thirty days in order to allow outstanding reports of Dr. Carlson to be added. (Tr. 49-51)

## III. MEDICAL HISTORY

Plaintiff's earliest medical records before this court are diagnostic tests performed at Swedish American Hospital after Plaintiff was injured in an automobile accident on October 11, 2000. (Tr. 186-190). A CT scan of Plaintiff's abdomen showed that Plaintiff's liver, spleen, pancreas, and kidneys were normal. (Tr. 186). An X-ray of Plaintiff's spine revealed a slight lower cervical kyphosis with no significant spondylosis. (Tr. 187). A chest X-ray showed potentially some interstitial fibrosis and scarring, but no acute findings.[1] (Tr. 188). A pelvis X-

---

[1] The X-ray also revealed chronic obstructive pulmonary disease (COPD), but the records indicated this was clinically unlikely. (Tr. 188). Plaintiff underwent pulmonary function testing

ray was unremarkable. (Tr. 189). Finally, Plaintiff's lumbar spine X-ray showed no acute osseous abnormality or spondylosis. (Tr. 190). Plaintiff was discharged after her tests and was given prescriptions for Vicodin and Soma. (Tr. 230).

After Plaintiff's initial emergency room visit due to her car accident, Plaintiff was evaluated by Dr. Quarles on several follow-up visits beginning October 12, 2000. (Tr. 230-231). Dr. Quarles told Plaintiff she had suffered significant soft tissue and ligamentous injury, cervical and thoracal lumbar strain, and a bruising of her spleen. (*Id.*). Plaintiff reported that the Vicodin that she had been prescribed to manage her pain made her drowsy, and was in "obvious discomfort" during this visit. (Tr. 230). Dr. Quarles switched Plaintiff's Viocodin prescription to Tylenol #3, prescribed Relafen and a soft collar, and administered a shot of Toradol. (Tr. 230). Plaintiff was advised to avoid vigorous activity and was told she would need six to eight weeks to feel normal again. (Tr. 231).

Plaintiff saw Dr. Quarles again on October 24, 2000. (Tr. 228). Plaintiff reported that she was still wearing her soft collar because it hurt to hold her head up, and she reported that it was extremely painful to sit still for more than thirty minutes. (Tr. 228). Dr. Quarles noted that Plaintiff had not started physical therapy yet and informed her that she would have to do so soon. (Tr. 228). In a follow-up with Dr. Quarles on November 30, 2000, Plaintiff reported that she was doing better with the physical therapy, but that she did not feel back to normal. (Tr. 227). Plaintiff described neck pain and pain in her lower trapezius and left sacral region to Dr. Quarles. (Tr. 227). Dr. Quarles commented that Plaintiff's whiplash was still severe, but improving. (Tr. 226). He continued her on Tylenol #3 and Relafen and recommended continued physical therapy. (Tr. 226).

on April 8, 2002, and the test results were normal. (Tr. 210-12).

On December 28, 2000, Dr. Quarles reported that Plaintiff had developed lumbosacral strain that was causing Plaintiff pain in her lower back and sciatica is her leg. (Tr. 226, 224). Though Plaintiff had been discharged from physical therapy for two weeks, which had much improved her neck pain, Plaintiff had continued with compensatory posturing that caused lumbar strain. (*Id.*). Dr. Quarles took an X-ray of Plaintiff's spine and noted spondylolisthesis of L3 on L4, but no acute abnormalities. (Tr. 224). Dr. Quarles recommended that Plaintiff resume physical therapy. (Tr. 224).

Through January 4, 2001, and February 13, 2001, Plaintiff attended thirteen physical therapy sessions. (Tr. 162). Plaintiff also started physical therapy on October 26, 2000, but it is unclear how many sessions she attended. (Tr. 165). The clinical impression projected eighteen therapy sessions. (Tr. 165). Plaintiff returned to see Dr. Quarles on January 26, 2001, after re-entering physical therapy. (Tr. 223). Plaintiff stated that her pain was not as severe as before, but that she was far from pain free. (Tr. 223). Plaintiff also asked for a referral to an orthopedist and chiropractor. (Tr. 223).

Plaintiff was examined by orthopedist, Dr. James Dougherty, on March 8, 2001. (Tr. 145-46). Her exam revealed her to be fully ambulatory without a limp or list. (Tr. 145). A repeat lumbar spine series X-ray revealed no evidence of spondylolisthesis. (*Id.*). Dr. Dougherty recommended that Plaintiff proceed with an MRI and told her she may be a candidate for lumbar epidural steroids. (Tr. 146).

On March 13, 2001, Plaintiff underwent an MRI of her lumbar spine. (Tr. 184). The MRI revealed posterior annular tears at L4-5 and L5-S1 and a small focal central disk protrusions superimposed upon diffuse disk bulge at the L3-4 interspace level. (Tr. 184).

7

However, there was no impingement upon traversing or exiting nerve roots and no spinal canal stenosis. (Tr. 184).

On April 10, 2001, Plaintiff was seen by Dr. Weiss for possible facet injection therapy at the Rockford Ambulatory Surgery Center. (Tr. 154-56). Dr. Weiss's exam revealed tenderness around Plaintiff's lumbrosacral junction. (Tr. 155). Plaintiff's range of flexion back motion was limited to seventy degrees at which point her pain would increase, while her range of extension was limited to ten degrees. (Tr. 156). Dr. Weiss diagnosed mechanical right-sided back pain and administered a facet injection during the visit. (*Id.*). Plaintiff reported approximately two weeks of fairly dramatic pain reduction after this injection. (Tr. 161). On May 10, 2001, Plaintiff underwent a second facet injection. (*Id.*).

Plaintiff again saw Dr. Weiss of Medical Pain Management Services on July 5, 2001. (Tr. 194). Dr. Weiss informed Plaintiff that she was a excellent candidate for a radio-frequency denervation of her lumbar facet joints, and Plaintiff expressed her desire to proceed. (*Id.*). On September 10, 2001, Plaintiff again met with Dr. Weiss after receiving the radio-frequency procedure on July 25, 2001. (Tr. 193). Plaintiff reported that she received no benefit from the procedure. (*Id.*). Dr. Weiss recommended diagnostic discography as another option for treatment, and Plaintiff said she would think about it. (*Id.*). Dr. Weiss stated that Plaintiff's impairments "would not necessarily be amenable to surgical intervention with the exception of possibly a complex fusion process." (*Id.*).

On July 2, 2001, an ultrasound of Plaintiff's pelvis revealed a three centimeter complex right ovarian cyst. (Tr. 183). Plaintiff saw a Dr. Nika on July 9, 2001, for treatment of the cyst, which was causing Plaintiff right-sided abdominal pain. (Tr. 221). Dr. Nika recommended a

follow-up in six weeks to see if Plaintiff's cyst has changed in size or if Plaintiff was still in pain. (Tr. 220). Another ultrasound on August 21, 2001 showed resolution of the cyst, but a cyst was spotted on Plaintiff's left ovary. (Tr. 182). Plaintiff followed-up with a Dr. Ackerman on August 24, 2001, because her right abdominal pain had moved to the left. (Tr. 218). Plaintiff described the pain as sharp and pulling, and she was very emotional during the visit, occasionally tearing up. (Tr. 218). Dr. Ackerman suspected cervical cancer, but Plaintiff's pap smear was negative. (Tr. 217-218). After examining Plaintiff, Dr. Ackerman referred Plaintiff to Dr. Soleanicov for a repeat ultrasound and prescribed Tylenol #3. (Tr. 218). An ultrasound on September 4, 2001, revealed a hemorrhagic cyst or endometrioma. (Tr. 181). Later testing was recommended. (Tr. 181).

Plaintiff saw Dr. Lopez on January 29, 2002, due to continued back pain. (Tr. 214). Plaintiff noted that she had participated in physical therapy for three months, which provided some temporary relief, but that she was never free of pain. (Tr. 214). Plaintiff stated that she had not taken much medication for her pain in the past month, but also that she thought she needed to start doing so again. (Tr. 214). Dr. Lopez prescribed Tylenol #3 and Relafen. (Tr. 214). Dr. Lopez also ordered a chest X-ray and recommended that Plaintiff resume physical therapy and pain management. (Tr. 214).

Plaintiff saw Dr. Lopez again on March 12, 2002, for chronic back pain. (Tr. 213). Dr. Lopez noted that Plaintiff was frustrated with her continued pain and was requesting to see a neurosurgeon. (Tr. 213). Plaintiff was able to bend approximately thirty degrees at the waist. (Tr. 211). Dr. Lopez mentioned changing pain medications, but Plaintiff refused, stating that other medications made her drowsy. (Tr. 213).

When Plaintiff saw Dr. Lopez on May 14, 2002, she complained of a new leg pain on the anterior aspect of her thigh that was exasperated when she was sitting. (Tr. 208). Plaintiff stated that Tylenol #3 alleviated this pain, but that she was worried about taking medications that made her drowsy while she was taking care of her children. (Tr. 208). Plaintiff described her mood as depressed and frustrated and stated that she slept four to five hours a night due to waking in pain. (Tr. 208). However, Plaintiff stated that her concentration, appetite, and energy were "okay," and she denied any suicidal ideations. (Tr. 208-207). At this visit, Dr. Lopez prescribed Paxil for Plaintiff's depression. (Tr. 207). He also noted that Plaintiff's new leg pains were consistent with her injuries and continued her on Tylenol #3 because Plaintiff refused stronger medications. (*Id.*). Finally, Dr. Lopez recommended pain management. (*Id.*).

On May 23, 2002, Plaintiff presented for reevaluation with Dr. Weiss. (Tr. 191). Dr. Weiss noted that Plaintiff should consider a diagnostic discography to treat the annular tear noted on a past MRI and medical management through chronic opiate therapy. (Tr. 191).

Plaintiff saw a Dr. Varghese on July 24, 2002, for lower back pain and upper leg pain. (Tr. 203). Plaintiff indicated the same symptoms as her prior visit with Dr. Lopez in May, but noted that her energy level was extremely down. (Tr. 203). Plaintiff noted that she did not feel like she could be a good mother due to her chronic pain, but did state that she felt much better with the Paxil. (Tr. 203). Dr. Varghese doubled Plaintiff's dosage of Paxil, and also switched Plaintiff from Tylenol #3 to MS Contin.[2] (Tr. 203-04).

Dr. Varghese completed a Lumbar Spine Residual Functional Capacity Questionnaire on December 23, 2002. (Tr. 264). Dr. Varghese reported that he was Plaintiff's primary physician,

---

[2]Plaintiff probably did not in fact switch to MS Contin, but must have switched to Vicodin at some point before June 18, 2003. *See infra* n. 5.

having treated her three time previously. (Tr. 264). Dr. Varghese diagnosed Plaintiff with lumbar radiculopathy, chronic back pain, and depression. (Tr. 264). He stated Plaintiff's pain was severe enough to interfere with her ability to concentrate and that drowsiness would also affect her ability to work. (Tr. 265). The doctor also opined that Plaintiff could walk one block and continuously sit and stand thirty minutes at a time. Further, he stated that Plaintiff would need a job which would allow her to shift positions at will, and which would require her to walk/sit/stand each for no more than five hours total a day with normal breaks. (Tr. 266). Dr. Varghese also limited Plaintiff's lifting capabilities to occasionally lifting less than ten pounds. (Tr. 267). Finally, the doctor stated that Plaintiff would need to be absent from work about four times a month. (Tr. 268).

On June 18, 2002, Dr. William Conroy, a state agency physician, reviewed Plaintiff's medical records and found that Plaintiff could perform light work with occasional postural limitations and avoidance of concentrated exposure to heights. (Tr. 195-202). Specifically, Dr. Conroy opined that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/sit/walk about six hours a day with normal breaks. (*Id.*).

Plaintiff saw Dr. Gerald Hoffman for a consultive psychological evaluation on October 8, 2002, at the request of the state disability examiners. (Tr. 233-34). Plaintiff told Dr. Hoffman that she became depressed six months prior and that her symptoms were that she didn't want to get up and face the day, preoccupation with her back pain, sad feelings, sleep disturbance, and sexual frustration. (Tr. 233). Plaintiff also stated that her Paxil prescription did not make her feel much better. She could not explain the difference between her report to Dr. Hoffman and her report to Dr. Varghese on July 24, 2002. (*Id.*). Dr. Hoffman noted that Plaintiff's depression largely stemmed from her feelings of inadequacy in being able to have a normal relationship

11

with her children. (*Id*.). Plaintiff's perception, concentration, judgment, abstract thinking, recall, and memory were ok or good. (Tr. 234). The doctor's diagnostic impression was Pain Disorder associated with both psychological factors and a general medical condition; Adjustment Disorder with depressed mood secondary to the chronic stressor of feeling inadequate in the care taking role; and Musculoskeletal Disorder secondary to trauma. (Tr. 234).

A state agency psychologist, Dr. MacLean, completed a Psychiatric Review Technique form for Plaintiff on October 17, 2002. (Tr. 235). Dr. MacLean reported that Plaintiff had an adjustment disorder that created a mild restriction on her daily living activities, her social functioning, and her ability to maintain concentration/persistence/pace. (Tr. 238, 245). In addition, Dr. MacLean completed a Mental Residual Functional Capacity Assessment for Plaintiff. (Tr. 249). He opined that Plaintiff was not significantly limited in most of the tested areas including understanding and memory, sustained concentration, social interaction, and adaption. (Tr. 249-50). Plaintiff was found to be moderately limited in her ability to remember and carry out detailed instructions, and her ability to respond appropriately to changes in her work setting. (*Id*.).

Plaintiff met with Dr. Carlson on February 21, 2003, but the record of the meeting is unreadable. (Tr. 256). On April 21, 2003, Plaintiff underwent an MRI ordered by Dr. Carlson. (Tr. 263). No significant changes to prior MRI's were noted. (*Id*.). Plaintiff discussed her MRI results with Dr. Carlson on May 28, 2003, but again, these records are illegible. On July 15, 2003, Plaintiff met with Dr. Carlson, and Dr. Carlson referred Plaintiff to Dr. Mansell of Medical Pain Management Services.[3] (Tr. 274). According to Plaintiff's testimony before the

---

[3] Records of the July 15, 2003, meeting were submitted after Plaintiff's hearing before the ALJ, but during the time period for which the record was left open to submit additional medical records.

ALJ, Plaintiff was given an option of surgery during one of her visits with Dr. Carlson. (Tr. 28). Because the records cannot be deciphered, the best account of the surgery option is the Plaintiff's, and she describes the surgery as one where little pins would be inserted in the bottom of her back to limit her motion. (*Id.*). Plaintiff stated that she felt she was too young for surgery. (*Id.*).

Plaintiff met with Nurse Ackerman on July 2, 2003, due to an increase in lower back pain.[4] (Tr. 277). Plaintiff reported that she thought Dr. Varghese had switched her to MS Contin, but that her prescription was still for Vicodin, which she takes four to six times per day.[5] (*Id.*). Plaintiff stated that the Vicodin decreases her pain to a "tolerable level, down to six or seven" on a scale of ten. (*Id.*). Plaintiff stated that she missed her last two physical therapy appointments due to her increased pain and a death in the family. (Tr. 277). Plaintiff also reiterated her desire to defer surgery as long as possible. (Tr. 278). Nurse Ackerman continued Plaintiff on Flexeril and Vicodin until she could meet again with Dr. Carlson. (Tr. 278).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

---

[4]Records of the July 2, 2003, meeting were never submitted to the ALJ, but were submitted to the Appeals Council in connection with Plaintiff's request for review. (Tr. 8). As such, the records are not considered for purposes of substantial evidence review, but are considered to determine whether Plaintiff is entitled to remand pursuant to sentence six of 42 U.S.C. §405(g). *See Eads v. Sec'y of Health and Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993).

[5]Plaintiff reported to the nurse that she was supposed to get a prescription for MS Contin from Dr. Varghese on June 18, 2003, to replace her prescription for Vicodin. (Tr. 277). However, the records before the court on this date are illegible. (Tr. 256-259). Plaintiff did meet with Dr. Varghese on July 24, 2002, and the doctor then attempted to switch Plaintiff from Tylenol #3 to MS Contin. (Tr. 203-04). However, it is unclear that Plaintiff ever took MS Contin because Plaintiff stated to Nurse Ackerman on July 2, 2003, that she thought her prescription for Vicodin had been switched to MS Contin, but that when she went to pick up the prescription, she was given Vicodin. (Tr. 277).

court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971(7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have

14

greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[6] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

---

[6]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[7] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically

---

[7]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that

17

sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis, the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to the decision issued on August 29, 2003. (Tr. 14). The finding of the ALJ as to Step One of the Analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

### B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from degenerative disc disease, adjustment disorder, and pain disorder associated with both psychological factors and general medical condition. (Tr. 17).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party, and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

### C.    Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, C.F.R. §

18

404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 14). The ALJ found that Plaintiff's "condition does not satisfy that standard." (*Id.*). The ALJ also addressed Plaintiff's mental disorder more specifically, noting that Plaintiff had no more than mild limitations in all functional areas, even considering the combination of Plaintiff's impairments. (*Id.*). As this court has seen on numerous occasions, the ALJ failed to discuss, or even cite the listing relevant to Plaintiff's disability claim. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand).

However, the Seventh Circuit has not decided whether failing to discuss or even cite a Listing at Step Three justifies remand. *See Rice v. Barnhart*, No. 03-3830, slip op. at 11 (7th Cir. Sept. 14, 2004)(declining to find that failure to reference relevant listing necessitates reversal and remand); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). Even though the Seventh Circuit has not provided guidance on this issue, principles of administrative law require the ALJ to rationally articulate the grounds for his/her decisions thereby building "an accurate and logical bridge from the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See*

19

*Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The question then remains whether this court should remand because of the ALJ's failure to cite the Listing or whether this court should determine if remand is necessary given the medical record. The problem with the latter is that it necessitates that the court weigh evidence, which is not an appropriate role for this court in this process. However, because the findings at Step Three are so conclusory, it is difficult to ascertain the process of this ALJ. Therefore, for the sake of judicial efficiency, this court will adopt a standard to handle conclusory Step Three analysis. That standard will be whether a reasonable ALJ could find that Plaintiff's impairments meet or medically equal an impairment in the listings.

Listing 12.04 states:

> *Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following:
> a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration;
Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 1.04 states:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness,

and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Plaintiff's impairments do not appear to meet or equal Listing 12.04. While Plaintiff does demonstrate some of the symptoms of an affective disorder such that she meets the requirements of section A of the Listing (*See* Tr. 233), she does not demonstrate a marked restriction of any of the activities under section B of the Listing, nor does Plaintiff's affective disorder meet or equal the requirements of Section C of the Listing. Plaintiff's depression has simply not restricted Plaintiff's activities to the extent required by Listing 12.04. (*See* Tr. 245 (Plaintiff's functional limitations considered mild or non-existent by Dr. MacLean), Tr. 249-50 (Plaintiff's Mental RFC showing Plaintiff is only moderately limited or not significantly limited in memory, concentration, social interaction, and adaption), Tr. 234 (Dr. Hoffman notes Plaintiff's concentration, judgment, abstract thinking, and memory are ok)).

Plaintiff's degenerative disc disease also does not meet or equal Listing 1.04. Under the Listing, Plaintiff must demonstrate compromise of a nerve root or the spinal cord. Plaintiff has not demonstrated such a compromise. Plaintiff's lumbar spine X-rays revealed no evidence of spondylolisthesis (Tr. 145), and an MRI revealed no nerve root impingement and no spinal stenosis. (Tr. 184).

Finally, neither party challenges the ALJ finding under Step Three. Therefore, this court finds that no reasonable ALJ could find that Plaintiff is disabled under the Listings. Substantial evidence exists to support the ALJ's Step Three finding, and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

**D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?**

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. (Tr. 16).  Before doing so, the ALJ determined Plaintiff's RFC.  The RFC is what the claimant can still do despite his or her limitations.  *See* 20 C.F.R. §416.945.  In determining a Mental RFC, the first step in the procedure is to assess the nature and the extent of the Plaintiff's mental limitations and restrictions.  20 C.F.R. §416.945(c).  This information is then used to determining the Mental RFC.  In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.  20 C.F.R. Ch III, Part 404, Subpart P, Appendix 1 12.00(d).  This information is then used to complete Plaintiff's vocational assessment.  After considering the entire record, the ALJ found Plaintiff's RFC to preclude the following work related activities:

> lifting more than 10 pounds occasionally; sitting, standing and/or walking for more than five hours each in an eight hour workday; more than occasional climbing; balancing, stooping, kneeling, crouching or crawling; bending from the waist; and sitting or standing for more than half an hour without the opportunity to change position.

(Tr. 14).

Under the RFC determined by the ALJ, the ALJ found that Plaintiff could not perform her prior work activities "since even [her] least demanding past relevant job required her to perform work activities inconsistent with the [RFC]." (Tr. 16).  The finding of the ALJ as to Step Four of the Analysis is not challenged by either party, and the court finds no reason to

23

disturb this finding. Therefore, the ALJ's determination as to Step Four of the Analysis is affirmed.

**E.      Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?**

The ALJ determined at Step Five that, based on Plaintiff's RFC, Plaintiff could perform a limited range of sedentary work. (Tr. 16). Specifically, the ALJ found, according to the evidence presented by the vocational expert, that Plaintiff could perform the jobs of assembler (5,000 jobs), inspector (1,000 jobs), and hand packager (2,000 jobs). (*Id.*). In support of the holding, the ALJ found that Plaintiff's complaints of disabling symptoms and limitations were not entirely credible. (Tr. 17). Specifically, the ALJ noted no clinical findings that supported Plaintiff's new complaints of pain as Plaintiff's MRI in early 2003 revealed no significant changes. (Tr. 15).

The ALJ also found that Plaintiff's RFC was supported by Plaintiff's day to day activities because Plaintiff takes part in some rudimentary child care and household tasks. (Tr. 15). Additionally, the ALJ noted that Plaintiff has not been specifically advised to not work. (*Id.*). Plaintiff's treating physician, Dr. Varghese, found that Plaintiff could walk/sit/stand for a total of five hours a day each in an eight hour work day with normal breaks, continuously sit/stand for thirty minutes, and occasionally lift up to ten pounds. (Tr. 266).

Plaintiff sets forth two main arguments against the ALJ's decision. First, Plaintiff argues that the ALJ did not properly consider records forwarded to the ALJ following Plaintiff's hearing. Second, Plaintiff argues that the ALJ failed to accurately account for Plaintiff's subjective complaints of pain and the RFC submitted by Dr. Varghese when the ALJ formulated

Plaintiff's RFC. Specifically, Plaintiff argues that the ALJ did not sufficiently articulate reasons, supported by evidence in the record, for the ALJ's unfavorable credibility determination and for rejecting portions of Dr. Varghese's RFC.

Defendant argues that the ALJ's finding is supported by substantial evidence in the record. First, Defendant notes that Plaintiff has not demonstrated how evidence submitted to the ALJ and Appeals Council after Plaintiff's hearing warrants remand of Plaintiff's case. Second, Defendant argues that the ALJ opinion did give specific reasons for her adverse credibility finding. Specifically, Defendant notes that the ALJ relied on (1) the reports of Plaintiff's treating physician, Dr. Varghese; (2) the lack of objective medical evidence (such as evidence of nerve root impingement or spinal canal stenois) supporting Plaintiff's subjective complaints of pain; and (3) Plaintiff's performance of household chores and her care of children. Defendant further argues that the ALJ did not reject the portion of Dr. Varghese's RFC regarding unscheduled breaks. Rather, Defendant argues the ALJ reasonably concluded, based on the vocational expert's testimony, that assembly, inspection, and packaging jobs could accommodate an unscheduled break every one to two hours as suggested for the Plaintiff by Dr. Varghese's report.

As to Plaintiff's first issue regarding new evidence, this court finds that the records submitted after Plaintiff's hearing do not entitle her to a remand. The single two page report submitted by Dr. Carlson (Tr. 274-75) referring Plaintiff to Medical Pain Management Services does not constitute a new line of evidence, and the ALJ was not required to address it individually in her opinion. Nothing new or striking was contained in the report as Plaintiff had participated in pain management previously. Also, the records were very brief and unreadable at points.

The three pages of records from Nurse Eve Ackerman (Tr. 276) were never submitted to the ALJ and are not considered for purposes of substantial evidence review. *See Eads v. Sec'y of Health and Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993). The documents could entitle Plaintiff to a sentence six remand (42 U.S.C. §405(g)) if Plaintiff demonstrated that "there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." (*Id.*). For the evidence to be considered material, there must be a "reasonable probability that the [ALJ] would have reached a different conclusion had the evidence been considered." (*Id.*). Plaintiff has not shown that the report by Nurse Ackerman created a reasonable probability of influencing the ALJ's decision. Plaintiff previously addressed most of the material contained in the report at her hearing,[8] and much of the material is repetitive of other instances where Plaintiff described her back pain to a physician. Thus, under §405(g), Plaintiff is not entitled to a remand for reconsideration of the July 2, 2003, appointment with Nurse Ackerman.

As to Plaintiff's second argument, the court finds that the ALJ's RFC and the ALJ's finding that Plaintiff is not disabled are supported by substantial evidence in the record. In this case, not one of Plaintiff's physicians ever indicated that Plaintiff is disabled. Plaintiff's own treating physician indicated in his RFC that Plaintiff is capable of working. (Tr. 264-68). In addition, the state agency physician found Plaintiff capable of work, as did the state agency psychologist. Besides the physicians' reports, other evidence in the record supports the ALJ's findings. Plaintiff is fully ambulatory (Tr. 145), and Plaintiff's MRI's revealed no evidence of nerve root impingement or spinal stenosis to support her claims of pain, nor has Plaintiff had any

---

[8]*See* Tr. 29, 35 (Plaintiff referencing new pain on left side).

26

back surgery. (Tr. 185, 263). Also, Plaintiff indicated on July 24, 2002, that she felt much better after beginning treatment with Paxil. (Tr. 203). Though Plaintiff later claimed on October 8, 2002, that the Paxil did not help much, Plaintiff could not explain her change in opinion from July. (Tr. 233).

While Plaintiff attempts to raise discrepancies between the ALJ's RFC and Dr. Varghese's report in light of the vocational expert's testimony, her distinctions do not hold water. Even excluding all other RFC reports but Dr. Varghese's, there is still no limitation that would warrant a contrary finding at Step Five. Each of Plaintiff's arguments against the ALJ citing lack of specificity in rejecting portions of Dr. Varghese's RFC falter because even Dr. Varghese's RFC supports a finding under Step Five that Plaintiff is capable of performing work existing in the national economy. Dr. Varghese reported that Plaintiff could lift up to ten pounds occasionally; complete repetitive reaching, handling without significant limitation; and sit, stand, and/or walk five hours each during an eight-hour work day with normal breaks, provided Plaintiff could change positions as needed every thirty minutes. (Tr. 266-67). Dr. Varghese's additional finding that Plaintiff would need unscheduled breaks every one to two hours also does not conflict with the production schedule of factory jobs, which the vocational expert stated set aside approximately ten minutes out of very work hour for a short break. (Tr. 47).

The only true area of conflict between the ALJ's RFC and Dr. Varghese's findings relates to the number of days Plaintiff would need to be absent due to her medical impairments. Dr. Varghese found that Plaintiff would need, on average, four days of absence per month. (Tr. 268). The vocational expert testified that factory jobs had an allowable rate of absenteeism of six to twelve days a year. (Tr. 48). The ALJ apparently concluded that Plaintiff would not need four

27

days a month off for medical reasons based on her finding that Plaintiff's complaints of disabling pain were not entirely credible.

While treating physician opinions are entitled to significant weight, opinions not well-supported by substantial evidence in the record do not control the decision of the ALJ. 20 C.F.R. §416.927(d). The fact that Plaintiff's physician checked a box in one question posed about predicting Plaintiff's future work absence rate is only one piece of evidence for the ALJ to consider. (Tr. 268). The ALJ could also see from the record that Plaintiff did not provide any medical records relating to her impairments from September 10, 2001, to January 29, 2002, when Plaintiff returned to see Dr. Lopez, noting that she had not taken much medication in the past month and thinking she should start again. (Tr. 214). Given the ALJ's supported decision for finding Plaintiff's complaints of pain not entirely credible and a holistic view of Plaintiff's medical record, this court finds that it was reasonable for the ALJ to conclude that Plaintiff would not need more medical absences than allowed by the vocational expert's testimony.

Rational minds may disagree as to the outcomes flowing from testimony presented, but the ALJ is given the power to weigh the evidence and make an appropriate decision. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). This court will uphold such a decision if substantial evidence underpinning it exists. (*Id.*). In this case, the court finds that there is substantial evidence to support the ALJ, and therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII.  CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above.

Defendant's Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 9/28/04